# Brown's Estate (No. 1).

210    493
213    605

*Decedent's estates—Claim for money received by decedent—Evidence.*

At the audit of an executor's account a claim was presented for a one-half interest in certain shares of stock. The claimant had been the decedent's stenographer, but had left his employment about two years prior to his death, although she continued to do some occasional work for him. After his death she took charge of his papers and personal effects, and

claimed his furniture by virtue of a bill of sale which he had made to her. She surrendered most of the papers to the executrix, keeping some as to which she had been notified by an attorney not to give up, as they related to a claim of partnership by a third person against the decedent. The evidence showed that at various times she had given the decedent checks out of her own bank account aggregating about $10,000. These checks and their stubs had words written on them connecting them with the stock in controversy. There was some evidence that these words were not written with the same pen and with the same ink as the body of the check, and that the stubs were in pencil while the checks were in ink. Several witnesses swore to conversations in which the decedent had admitted the claimant's joint ownership of the stock, consulted her about what should be done with it, advised her not to sell, though she wanted to while it was going up in price, and added up the profits showing half of them to be hers. There was evidence that the aggregate amount of the payments fell somewhat short of the price paid for one half of the stock, and that claimant's payments did not correspond in time and amount with decedent's payments for the stock, but there was no evidence that the payments had been made for any other purpose than the purchase of the stock. There was evidence that the deceased treated the stock as his own and borrowed money on it, but this course of business was not unusual with him. It also appeared that three other women and one man had given money to the decedent to invest under circumstances somewhat similar to those of the claimant, and that the claims of these persons had been allowed. *Held* (1) that the circumstances did not establish any such confidential relation as to require of claimant a higher measure of proof than in ordinary cases; (2) that the claim should have been allowed.

FELL and BROWN, JJ., dissent on 2.

Argued Nov. 2, 1904. Appeal, No. 189, Oct. T., 1904, by Nattie W. McLean, from decree of O. C. Allegheny Co., May Term, 1904, No. 54, dismissing exceptions to adjudication in Estate of Joseph O. Brown, deceased. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT and THOMPSON, JJ. Reversed.

Exceptions to adjudication.

The facts are stated in the opinion of the Supreme Court.

*Error assigned* was in dismissing exceptions to adjudication.

*Clarence Burleigh*, of *Burleigh, Gray & Challener*, with him *D. T. Watson* and *Edmond Englert*, for appellant.

*Wm. B. Rodgers*, with him *J. Rodgers McCreery*, for appellee.

Opinion by Mr. Chief Justice Mitchell, December 31, 1904:

Appellant's claim is for a joint ownership with the decedent, to the extent of one half, in certain shares of stock of the Colonial Trust Company. The evidence as to the relation of the parties was that appellant had been stenographer for the decedent, but had left his employment about two years prior to his death though she continued to do some occasional work for him, as he was a boarder in her mother's house. He died suddenly in March, 1903, and appellant appears to have taken charge of his papers and personal effects, including his watch, and the furniture of his room, which she claimed as hers by virtue of a bill of sale. The making of such bill by him does not seem to have been denied. There was some evidence as to the destruction by her of some of his papers, and as to failure to produce others. As to these points the learned judge below considered her testimony somewhat conflicting, and accordingly concluded that "In view of the confidential relation in which this claimant stood to Mr. Brown, the advantage which she has had in the possession of his papers and the suspicion of intentional concealment to which her conduct has given rise, it is very plain that a higher measure of proof ought to be required than in ordinary cases."

In this view we are unable to concur. There is no evidence from which any confidential relation can be inferred which bears in any way on the present claim. Though as stenographer appellant may have been intrusted with confidential matters, there is no evidence at all that they in any way concerned the present claim or her personal interests, or were other than pertained to her duties as stenographer. She was an employee and the transfer by her of large sums of money to her employer was certainly not evidence of her seeking to profit by a confidential position. The natural inference would be the other way.

With regard to the matters of "the advantage she had in the possession of his papers, and the suspicion of intentional concealment to which her conduct has given rise," it is to be said first that no suggestion has been made as to wherein any such advantage would accrue to her either from possession of the papers or from the suspected concealment, and, secondly,

that the facts shown by the evidence do not bear out at all clearly the unfavorable inference. Upon demand, shortly after his death, appellant turned over a large quantity of books and papers of the decedent to his executrix the only reservation of any moment shown being in the case of papers relating to a certain coal and lumber company as to which appellant had been notified by an attorney of a claim of partnership and warned not to let them go out of her possession. Appellant's explanation of her conduct in regard to decedent's papers was plausible even if not entirely satisfactory, and the inference of advantage or intentional concealment cannot fairly be said to rest on anything stronger than suspicion. The learned judge was therefore in error in requiring of the appellant a higher degree of proof than in ordinary cases.

The burden of proof of her claim, however, was upon the appellant. In support of it she produced six checks for various sums amounting in all approximately though not exactly to one half the purchase money of the stock now in controversy. They were drawn by appellant upon her private bank account to the order of decedent, and indorsed by him. That they represented money given to him by her is not contested, and she showed that the money was in her own name and her own bank account. Each of the checks had the word "Colonial" written diagonally across the left upper corner, and the stubs were marked "Colonial Stock Acct.," "for Colonial Trust Stock," "payment on Colonial Stocks," "Colonial Stock settlement," etc. These checks and stubs were offered as direct evidence of the payment of the money on account of the colonial trust stock. In further support of this point appellant produced witnesses who swore to conversations in which the decedent had admitted appellant's joint ownership of the stock, consulted her about what should be done with it, advised her not to sell, though she wanted to while it was going up in price, and added up the profits showing half of them to be hers.

Against this prima facie case it was pointed out that the purchase of the stock had been made by decedent in his own name more than a year before his death, that no written evidence was produced from his books or papers showing any recognition of the claim now asserted and that in his dealings with it he treated the stock as his own, borrowing on it at three

different dates amounts aggregating somewhat more than the entire purchase money. In regard to the checks and stubs it was objected that neither in dates nor amounts did they correspond with the payments made by decedent on the stock; that there was expert evidence that the word " Colonial " on the checks was not written with the same pen and the same ink as the body of the checks ; that the stubs were in pencil while the checks were in ink ; and that three of the checks were printed by a different firm from that printing the stubs from which they professed to be torn. On this branch of the case the court found that there were irregularities that called for explanation but were not explained, and therefore that " proof of the connection of these checks with the purchase of colonial stock has failed; and they must relate to other transactions between Brown and McLean which are admitted to have taken place."

On this branch of the case the evidence is so much in equilibrio that we should hesitate to come to a different conclusion from the court below. The testimony of the witnesses as to decedent's admissions of appellant's joint ownership is not so easily disposed of. The court below sum it up by saying that " Conceding the story to be true it amounts to no more than evidence of a promise of gratuity which is incapable of enforcement." We do not think this a correct view. A promise of gratuity on which $10,000, nearly the whole value, is paid by promisee is much more than a naked promise which the law will not enforce. But the testimony itself is to much more than a promise, it is to repeated and positive admissions of appellant's joint rights in the stock. It is uncontradicted and notwithstanding the interest of the witnesses, one a sister and another a nephew of the appellant, the court does not find it unworthy of belief. If true it makes out the claimant's case.

The want of coincidence in dates between the checks and Brown's payments on the stock loses much of its significance in view of the fact that his purchase was paid for in installments and appellant's contributions, if for this purpose, were likewise in installments. And for the same reason the deficiency in the aggregate amount of the checks, compared with half the purchase price, may merely show that there is a bal-

ance of some hundred dollars due by appellant on her payments.

Further the conduct of decedent in treating the stock as his own, and the absence of any written evidence by him of recognition of appellant's joint ownership are shown by the evidence in this same audit of his estate to be not unusual in his unsystematic method of doing business.

Three women presented claims for money given to Brown to invest under circumstances somewhat similar to those of appellant, and the claims were allowed, and the claim of one man, O'Mara, of the same general character, was allowed on the testimony of present appellant and her sister, the principal witness in regard to Brown's admissions.

On the whole case we must start with the uncontested fact that appellant gave the decedent ten thousand and odd dollars, and the crucial question meets us at every point, what for? There is no suggestion that it was in payment of any debt to him, nor that it was not her own money. Her claim is that it was for the purchase from him of a half interest in this stock. The checks by which the money was passed over approximated quite nearly to the required aggregate; they were given during or shortly following the period he was making his own payments for the stock; and there was positive and uncontradicted testimony by two witnesses that Brown repeatedly admitted appellant's title to one half the stock. On the other hand, the argument is made of the want of correspondence between the checks and Brown's payments for the stock, both as to dates and amounts; the discrepancies as to the stubs; and the natural bias of the witnesses as well as the unsatisfactory character of their testimony. All this is merely criticism of the appellant's evidence, forcible as far as it goes, but how does it meet the vital and constantly recurring question, what was the money given to Brown for? The only answer suggested is the conjecture that it was for some other transaction, the date, amount and character of which are not even suggested in the evidence.

If this case were before a jury it is hardly open to doubt that they would and probably ought to render a verdict for the plaintiff, and under the evidence the court should take the same view.

Decree reversed and claim directed to be allowed.

FELL and BROWN, JJ., dissent, as to the allowance of the claim.